Good morning, your honors. May it please the court, I am Latoya Merritt and I serve as counsel for Jackson State University in this matter. This matter is before your honors because of Jackson State's decision to terminate coach Denise Taylor, the head coach and the self-proclaimed face of the Lady Tigers women's basketball program. I will submit to your honors that this case is unique in that unlike most of the appeals that come before this court, this appeal actually springs from the district court's determination regarding two common law state law claims. Claims for breach of contract and claims for invasion of privacy. Because the district court's findings are incompatible with established precedent and has created uncertainty for public universities and other public entities, Jackson State respectfully requests that this court reverse and render judgment for Jackson State. Your honors, I'm going to start with Coach Taylor's breach of contract claim. In this case, the jury awarded $182,000 for breach of contract. Fatal to Coach Taylor's claim is her failure to show that Jackson State actually breached her employment contract. When, as here, the conduct underlying an alleged breach is undisputed, the breach element represents a question of law, not a question of fact. And that comes from the Mississippi Supreme Court's case of Cawthorn versus Vickers. In this case, your honors, Coach Taylor's employment contract allowed her to be terminated for cause and without payment if she violated her head coach's duties, any Mississippi or federal criminal laws, or NC2A rules. In this case, Coach Taylor's duties as head coach required her to know the university's policies and to ensure and monitor that the women's basketball program was in compliance with Jackson State University's policies. Do you think that there's a materiality requirement here? No, your honor. There is not a materiality requirement. There's only a requirement that there be policies, relevant policies from the university, and that those policies were breached. Can you cite the Mississippi case that says materiality is irrelevant? Yes, your honor. Yes, your honor. That's the Cawthorn v. Vickers case. Here, your honors, we cited in our initial brief, in our reply brief, in our white pages, several examples of breaches by Coach Taylor. In the interest of time, I'm going to just point out a couple of those examples. As your honors are aware, by the leading case on this point, the Hoffman case, that is a Mississippi Supreme Court case, that the Mississippi Supreme Court has cited that it only took one violation, one breach, in order to substantiate the university's decision to terminate Coach Taylor. For my examples, the first one that I will point to, your honors, and these examples are on page three and four of the Jackson State University's reply brief. The first one is Coach Taylor's inappropriate use of per diem. Per diem are the funds that are provided to coaches or other employees to allow them to feed students when they are on trips representing the university. In this case, based upon an audit of the women's basketball program for one year, Jackson State University found 28 violations. 28 times that Coach Taylor actually used per diem that had been allotted to feed girls and other trainers from the university to use that to feed her child. The university policy specifically states, the athletic department travel policy, states that travel advances would be... I thought there was evidence that other coaches had done that. Yes, your honor. There was evidence submitted at trial that other coaches had done that, and I will also tell you, your honor, that it was uncontroverted. There was one coach, the football coach, whose son had traveled with him. The football coach's contract, unlike Coach Taylor's contract, allowed for his son to travel with him. That was a negotiated term of his contract. Coach Taylor did not negotiate in her contract for the university to pay to feed her son on 28 separate times. How much money are we talking about here? Your honor, as it relates to the per diem term sum, we're talking about roughly about $1,400. It's interesting, I think it's important to note that coaches are required to submit advance sheets that have the names of players, presumably your students, who are going to be awarded funds for per diem. On Coach Taylor's advance sheets, in between the names of the traveling 12 to 15 student-athletes, she inserted her son's name, Taylor Carr, without any reference to that being her child or any reference to that not being a JSU student, such that anybody reviewing those advance sheets would believe that that name was the name of a student-athlete. Another example, your honor, that I would like to point out to you all is the improper use of laundry money by Coach Taylor. When teams travel, there's a form that allows them to receive monies in advance. And she used it for Gatorade and snacks. Your honor, that's what she testified to. However, if you look at the actual university policies, it states that if you're seeking reimbursements or funds that you have to present and submit, itemize receipts. So although she testified that she had used that money for Gatorade and snacks, she also testified that she didn't provide any receipts. So it's the university's position, first of all, that if those funds were going to be used for a reason other than the reason that was presented to the university via the forms, that there should have been documentation under policy. She said for reimbursement. She wasn't seeking reimbursement. She was just saying, since the team we were visiting did our laundry for us, we didn't spend the $80. And I used the $80 to spend on Gatorade and snacks. She wasn't seeking reimbursement. She was just spending the laundry money already allocated. Yes, your honor. But as part of the monies being dispersed, seven days after a coach or any person that's been given in advance returns, as your honors can imagine, there has to be an accounting of those funds. So to the extent that you have additional monies, sometimes coaches do spend personal funds. They submit receipts and they're reimbursed. But also to the extent that you are using funds outside of the purpose for which you have stated that those funds are going to be used, the university expects from this policy that coaches will provide receipts. How much money are we talking about the laundry money? For the laundry money, your honor, we're talking roughly about $3,200. And in total, your honors, based on the audit that was done by the university, for the almost year period that covered May of 2010 through May of 2011, the university's internal auditor determined that Coach Taylor actually owes Jackson State approximately $4,500 for her misuse of those funds and for her violation of Jackson State's policies. Does that include the airfare for her family? Yes, sir. Yes, your honor. That also includes the airfare for her family. And again, your honor, that was another inappropriate use in violation of policy that was not allowed by her contract and that had not been sanctioned and approved by the university. Your honors, I think it's very important to point out, Judge Owen, you kind of brought this out in a question a minute ago about what other coaches may have been doing. And I mentioned about the football coach who had negotiated for his son to travel with the team and that had been approved. For purposes of common law of contract, breach of contract, motives do not matter and also comparative evidence of what others may have done or even maybe even past conduct by the employee at issue don't matter. What matters is whether or not the university, the employer in this situation, can point to a breach that justifies termination of the contract. I think it's important to point out, too, that the district court, in its opinion, analyzing the breach of contract claim did not cite to a single Mississippi state law case. Instead of citing to Mississippi state law, the district court instead cited to federal Title VII discrimination and retaliation cases. And as you all know, while motivation may matter in those federal discrimination and retaliation cases, motivation does not matter when it comes to a breach of contract case. And for that reason alone, Jackson State believes that the decision of the district court, as it relates to its judgment as a matter of law, should be reversed. Under Mississippi court law, Mississippi state law, it is clear that motivation does not matter. Evidence regarding what comparators may have done for purposes of state law claims do not matter. And I'll submit to your honors that this rule is not just unique to Jackson State. This is a rule that's followed by several courts across the country. Alternatively, Jackson State has asked for a new trial. In the alternative, based on the court's refusal to instruct the jury on Hoffman, and given the number of various claims, Title VII and Title IX claims in this case, it was clearly an abuse of discretion for the court not to make it clear to the jury that, as it related to her breach of contract claim, that motivation and any subjective intent did not matter. Your honors, I'd like to move on to the invasion of privacy claim that was decided a couple of weeks after the jury trial upon a bench brief from the district court judge. In that case, the district court judge awarded $200,000 in damages for alleged invasion of privacy based on Jackson State's disclosure of nine pages, nine pages of information related to its intent to terminate Coach Taylor. The publicized facts in this case did not involve a matter of concern regarding Coach Taylor's private life. What Jackson State University provided was a notice of allegations that dealt with the employment behavior of a coach who had self-identified herself as being the face of the basketball program and who stated during the trial that the public was interested, because of her being the head of a prominent basketball program for a university in that state, in what was going on with her employment. I note again that what Jackson State released was a summary of allegations. Allegations regarding purported misappropriation of state funds and allegations regarding the alleged mistreatment of student athletes. One other component, the next element, endures that there must be some type of showing that a reasonable person would have been offended by the release of that information. By Coach Taylor's own admission that she was the face of that program and that the public was interested in what was happening with that program, I submit to your honors that a reasonable person, that she should not have been offended by Jackson State releasing a summary of allegations about how she was treating student athletes and also her actions in relation to public funds. The last element, your honors, that has to be shown is that the information provided by Jackson State was of a legitimate public concern. Here there are two reasons for sure that show that those documents dealt with information of legitimate public concern. The first one is Coach Taylor's own admission. She stated in her direct testimony at trial was, I'm a coach that has been in this community and have done lots of positive things in this community for 10 years. So it is public knowledge that what's going on with this situation, that's going to be reported to the media. Coach Taylor further went on to testify and state that the media had a responsibility to the public to know what was going on with that situation. And that comes from pages 2212 through 2213 of the Record of Appeal as well as page 2215. Along that vein, your honor, I want to lastly talk about the implications of the confusion that this order has given to public universities. We mentioned a... Your honor, you have exceeded your time. I'm sorry, your honor, I'll pick up with that. Thank you, Judge. May it please the court. Good morning, I'm Nick Norris, I represent Coach Taylor in her case against Jackson State. First to address the breach of contract claim. The defendant alleges that the comparator evidence is not really relevant. They cite to the Cothern case and say, well, as long as we can say there's a breach, it only becomes a question of law. But that's only if there's undisputed facts. There are disputed facts here. And what we put forward with not only the other coaches taking the same actions, but the business manager directing her to take those actions, and the athletic director and coordinator approving, expressly approving these actions. And Jackson State may say we did not do that, but that was up for the jury to decide, and they ruled in our favor. One of the issues that they've just talked about and the court brought up was the travel. We spent over an hour in trial talking about Coach Taylor negotiating with another university, paying for Coach Taylor's husband and son to fly to Texas for a game. And then in their reply brief, they admit that another male coach did the exact same thing. He negotiated for a trip to Florida. And that wasn't in his contract that he could just go off and do that. There's no evidence of that. But that's where it goes back and forth. In their reply brief, they tried to say, well, here are undisputed policies. But if you look at those policies, she really didn't violate them. The first one they identified is the travel policy, and they said the policy states that travel advances will be issued for employees who accompany students traveling. That's true. They do offer travel advances for employees. But there's nothing in that policy. What about for their families? But there's nothing in the policy that says they cannot issue travel advances for family. Why does it have to negate it? If it doesn't give them express permission, then you have to assume. Well, no, that's assumption. And then you have to look at what the practice was. And it wasn't that. And if the policy had said we will only issue travel advances for employees and nobody else for no other reason, that may be a little harder argument. But that's not what it says. It says we will do this. That doesn't mean we won't do it for other situations, like with other coaches, football coaches' wives. That's the issue with each one of these policies. Weren't those negotiated in advance? That's their allegation. The jury was left to concede that that was not true. They offered no contract for that. There's no evidence on that. And even if it was in the contract and the contract was put forward, that doesn't mean you can contract to violate their policies. It's still a violation of their policy on there. They're saying in these coaches' contracts you can't violate any policy on there. It's the same thing in Coach Taylor's situation, frankly, in that, where they're saying in an express contract, assuming that was the case, that we're going to allow you to violate that policy and in that same contract say you can't violate any policies. It's the same thing as JSU's business manager, travel coordinator, athletic director confirming these things and saying, yes, this is fine. You can do this on there. It's the same thing. One's oral, one's in writing. That's the only difference. And also in advance. No, in advance. No, this was not like something that Coach Taylor – this is not a one-time thing. No, I'm talking about the other ones who in advance got written authority to do this. Right, and she had written oral acknowledgment. I mean, not written, but she had advance oral acknowledgment. That's what her testimony is, is that this is something that happened over years and that she did every time that she worked for the university, every game. For instance, with her son that rode with her, they knew she was a single mom and her son, I think, was three or four years old when she got hired. They knew she was going to be traveling with her. No one disputed that. She's a very public figure. They all knew her son. When she listed her son on a meal receipt, they knew who Taylor Carr was.  They know Taylor Carr is not a player. For them to argue otherwise was really silly on there. The other thing with the meals on there, they say – here's just another example of where they're mischaracterizing policies. It says, well, the policy states each person who has provided a meal must be listed with the receipts. Well, each person was, and their violation is, well, she listed somebody who ended up not eating on there. But that's not a violation. There's nothing in the policy that says you can't list somebody who didn't get a meal. It only says anybody who did get a meal must be listed, and everybody who did get a meal was listed. That's the problem with a lot of this stuff, and it even gets even vaguer as you go down this list in the reply. The next one is, well, she just has to take full responsibility. It's the most vague policy that you can get. All through this, the defendant knew what Coach Taylor was doing, not just knew it, but expressly approved it, directed her to take those actions. Coach Taylor testified the business manager directed her to take those actions. So it's one thing, and one other thing to consider is we went on three claims. We went on the breach of contract claim, breach of implied covenant of good faith and fair dealing, and invasion of privacy. Jackson State has never appealed or briefed this issue on breach of implied covenant of faith and fair dealing. So even if the court would say, well, they may not have breached the contract, but they breached the covenant of implied faith and good dealing by the way they handled this, the effect is the same. What about the jury's giving zero for emotional distress and retaliation? For, are you talking about with regard to the invasion of privacy claim? Yeah, the emotional, they gave zero. They gave zero and the invasion of, they gave zero for the breach of contract, what they were dealing with on the breach of, it dealt with the breach of implied covenant of fair dealing. The breach of contract doesn't, I don't know if it has an emotional pain serving, but either way, it dealt with determination. And what we illustrated through our brief is the primary thing that caused Coach Taylor the emotional pain and suffering was not the losing of her job. It was the losing of her reputation. She has never been able to coach in the college arena since. This trial was in 2013. She got terminated, I think, in 2012. And her career is ruined. She ended up having to move to another state because of the embarrassment of the invasion of privacy claim where they listed out that she had sexually harassed students when there was no evidence of it and they don't even hardly mention it in their brief. And it really tarnished her reputation. She talks about at some points where she was numerous times thinking about committing suicide because she couldn't get a job. All you had to do was Google her name and find out that there was all these bad things about her. And even though she's won her case at trial, nobody will touch her. She's making an interview, but she can't get hired. One, she's been out too long. But two, her reputation is gone, and this is still on appeal because any university can't take the risk because we're still here. And if this court would reverse, well, then they've hired potentially someone that has allegations of sexual hostile work environment on there, and they can't take that risk. Any reasonable person could look at that and say this is what caused it. Let's talk about the breach of privacy because there were allegations, and they said what they said. Did the university misrepresent the allegations ever? Yes. There were no allegations of a sexual hostile work environment. I thought you just said there were. No. The university said there were. They used those words, sexual hostile. Yes, that's in the nine pages. I thought that there were allegations by players that their sexual orientation was made a big issue by the court. No. There was an allegation in about questioning about someone. I'm sorry. There was a statement. We went in and asked those students about that, and they didn't confirm it. I think at one point there was one student who had been hit over the head with a gun by her roommate, and she was upset that Coach Taylor was interfering in her life, and I think they had made some statements that she thought maybe she was doing it because she was gay, but everything turned out to be false. Well, my point is whether you went back and re-interviewed him and made the judgment it was true or false. Well, the jury did. Well.  I thought that did not go to the jury. No. The jury looked at these issues, and for there not to be a breach of contract. I'm talking about privacy claim. No. For the privacy claim, that was the judge. That's what I'm saying. But this was ruled on by the jury. What did the jury rule on the privacy claim? No. What you look at is the sexual hostile work environment is hands down a policy violation. I'm talking about the privacy claim. Yes. Separate and apart from the breach of contract claim. Okay. You got a separate $200,000 reward for privacy. It's a separate claim that relies on very similar facts. I'm talking about that claim, not the jury trial. It was by the judge, not the jury. Yes. So we're talking about that claim set aside the breach of contract. Was it disputed or undisputed that women on the team made certain allegations against the coach that had to do with their sexual orientation? There were at least one player that made that allegation. I do not remember the name, but there was at least one player who wrote a statement that implied that issue. Now, why is that private? The player could have told anyone. The player could have gone to the newspaper. Why is it a breach of privacy to truthfully tell, release a record that says this allegation has been made? Because they didn't release the statement, one. But, two, it was covered under state law to be a private. It was not public. If it was public, they could have released it. The Mississippi Public Records Law required that those personnel records, this was all part of her personnel record, that it not be made public. And certainly we agree that a head female basketball coach sexually harassing a student could have a public interest to it. I mean, that certainly, or... If it's in the personnel record, you can't release it ever at all. That's correct. You cannot release it under a Public Records Request Act. And what they did, if you really look at particularly the motive to it, frankly... Can you give me the cite to the statute that says there's no exceptions? If it's in the personnel record, you can't release that record? Well, hold on just a second. If it's in your brief, we'll find out. It's in my brief. I cite to the particular statute that puts an exemption for personnel records. It talks about all the public records that can be made and personnel records are that. There's no listed exception to the personnel record on there. And that's the big issue with our invasion of privacy claim is the law says these issues are private because they were part of her personnel record. And I don't dispute that a public could have some interest in an issue like that, but the problem is it's false. They knew it was false. They took nothing from these students, and the reason they hardly interviewed anybody. They didn't interview Coach Taylor. They didn't release the written statements to the claim ledger. They wanted to leave it as vague as possible because they didn't want Coach Taylor to go back and provide any of us to dispute it. They were more interested in protecting students, not Coach Taylor, and protecting their false allegations. One student's complaint was Coach Taylor was treating her too well. That was the entire complaint on there. They didn't want the claim ledger to see that. They didn't want to see any of the other things that could have been easily followed up on. Any of the misuse of funds issue, the claim ledger would have been easily been able to interview any male or female coach out there to show that they did the exact same thing, and JSU just is not really a policy violation. Well, let's look at the big picture. Yes, sir. You had a six-week trial. Yes, sir. Jury trial followed by a bench trial or the equivalent. Right. Well, it wasn't a bench trial. It was just a jury trial, and then the court ruled based off the transcript. Right. Yes, sir. And so you had a judge judgment and a jury judgment. That's correct. Six weeks. Both are claiming, if I understand what both of you are advocating, is that we order a new trial. I am advocating a new trial on Title IX alone. We are saying that the court issued the wrong causation. I'm glad you went to that. I was about to. I was looking at my time. It was issued the sole causation standard, and the court relied on the Fifth Circuit precedent on the first Title IX retaliation came where the Fifth Circuit was the first circuit. So there are major portions of this six-week combination jury and judge trial that either side has problems with. No. This would not have to be tried over again if only the Title IX goes back on the issue, not the entire trial on there. No, that's what you want. Right. That's not the only thing the university wants. That's correct. If they want an entire trial and go back and do the whole six weeks. So if we take both of your positions, it's like those things in the kids' magazine. How many birds can you find in this tree? There's so many things wrong. Well, there's not so many things wrong, and that's what we're arguing is there's not. The only issue that we are contending is wrong is the Title IX, and it's very glaring. The Supreme Court in Jackson held that it's a because standard. That's your complaint, and they've got other complaints. But those are not valid on there. Well, they may not think yours is valid. They have argued that the Supreme Court should be disregarded, and they didn't really mean because when they said because. And I guess you can say the Supreme Court doesn't mean because when they say because. But that is what the Supreme Court has said. They've been very consistent on it in Nassar and Gross and Jackson on there. And any time there's been a different standard, the statute has explicitly stated it. So how does the jury verdict stand up to the requirement that it be deliberate, serious, and willful? I'm sorry, I don't understand that. Well, that's the requirement for these type of— For Title IX. Yeah. Yes. Well, it requires intent. Yeah, I mean, that's a—we don't dispute that it requires intent. I think we provided evidence to support there's intent. The issue is the causation standard on there. There's certainly evidence based off Coach Taylor's Title IX complaints, both orally and in writing to the President right around this time that a player complains, and they decide to gin it up and run with it on there. I'm certainly not excited about going back and trying a case for six weeks, and if we go back on Title IX retaliation, we will not. It will be an undisputed fact that they breached the contract. It will be an undisputed fact that invasion of privacy. And so it will basically be looking at, well, based off those undisputed facts and the other causation facts to that, along with emotional pain and suffering, is there enough for causation for that? The juries are—I mean, the judges are a ruler of emotional pain and suffering, so I don't think he would allow me to add on to that. But certainly for back wages where she was limited on her breach of contract claim to the remainder of her contract, in a Title IX retaliation claim, she would be allowed back wages up until trial and potentially future wages or reinstatement. Well, I take that back. I don't know if reinstatement is an option. But future wages potentially and attorney's fees, which were not allowed under breach of contract invasion of privacy. That's just not a possibility because we're dealing with a university. They cannot have punitive damages against it. So there was no possibility of attorney's fees. The Court has no further questions. I will yield my time. Thank you. Thank you, sir. May I honor briefly? Yes, you may. Thank you, Judge. Just to address some of the questions asked by Your Honors, to be clear, Jackson State University has only requested a new trial in the alternative. We believe that as it relates to the breach of contract claim and the invasion of privacy claim, that this Court should rule in favor of Jackson State based on the state of Mississippi state law on those claims. Well, let me talk to you about that for a minute. You are adamant that there's no materiality requirement under Mississippi law. And that may be the case. But her contract said, cause means deliberate, serious, and willful violations of the head coach's duties defined in the agreement or refusal or unwillingness to perform such duties in good faith. Now, it seems to me that what she did regarding the laundry money, the travel money, all of that, it was a jury question as to whether that was deliberate, serious, and willful violations. Don't you think that's a fact question? No, Your Honor, because you did read the portion of the contract that says a refusal to perform those duties in good faith. And we would submit to the Court that the evidence is undisputed on that because of the language of the policy. The policy specifically states that those travel advances will be issued for employees to be used. She argued you said good faith. That's in the contract as well. To be, I'm sorry. It's qualified by good faith. Yes, Your Honor. Was there testimony or not that her superiors approved each of these things? Your Honor, I'm glad you went to that because I do want to address that. The testimony that was in the record, just to address a couple of things that she said, her superior, based on her contract, was the athletic director. She testified that the athletic director had approved it because he allegedly signed on those travel advances. I would remind the Court that him signing off on a travel advance that states that you're going to use $40 to $120 for laundry, when you take that money and you use it for another purpose other than what's stated in that advance, is him approving the use of funds under a false pretense. When the athletic director signs an advance approving it for you to get funds for laundry money, and you say that it's $120 for that, and you take it and use it for another purpose, you have not used those funds for the purpose for which it was approved by the athletic director. There's a bright line. No, that's good faith. That's not good faith, no matter what. I think the problem here is that because the policies, and also her contract, required her to ensure and monitor that those funds were going to be utilized properly under the university's policies, that when you take funds and you use them in a different manner, and you do not account by showing receipts for how those funds were used under the policies, that that's not acting in good faith. When you're dispersed with state funds, there's an obligation to make sure that you're going to use those state funds in the way that you've represented, that you're going to use them, or to show receipts. There has to be documentation of how you've used those funds, and that did not happen here. Your Honor, you asked a question, Judge Owen, about the actual information. What was the information regarding the allegations in terms of the invasion of privacy claim that Jackson State had submitted? In the record, the actual record site pages are 4027 through 4038, that actually show the pages that Jackson State University had released to the clearing ledger. On those pages, it specifically says that there were allegations, and specific charges against you that included student and student athlete well-being, and under that it includes the sexual gender stereotyping. Now, there's been a misrepresentation here that there weren't complaints received by Jackson State. There were complaints received by Jackson State. There were 12 student athletes that came to Jackson State and complained about how they had been treated by Coach Taylor, and that precipitated the audit and the full investigation. Jackson State didn't make up these allegations. The allegations were presented to it in full. I see, Your Honor, that my time has expired, and I would ask that you consider Jackson State's arguments in its briefs, as it relates to all the claims that have been presented, including the Title IX request for a new trial by Coach Taylor. Thank you, Your Honor. Thank you. That's right. The cases argued today will be taken under advisement and will be decided and so forth. This panel will now recess until 9 o'clock tomorrow morning back at our courthouse on Camp Street. Thank you.